IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. |
| ) | 10-00244-02-CR-W-DW |
| BRADLEY COOK, ) | |
| ) | |
| Defendant. ) | |

**DETENTION ORDER**

On September 10, 2010, the government moved to detain defendant Bradley Cook pending trial, and on September 28, 2010, I held a detention hearing. I find by a preponderance of the evidence that defendant poses a flight risk and that no single condition or combination of conditions of release will reasonably assure the appearance of defendant as required. In addition, I find by clear and convincing evidence that defendant poses a danger to the community and that no single condition of release or combination of conditions of release will reasonably assure the safety of the community.

*I. BACKGROUND*

On September 8, 2010, an indictment was returned charging defendant with conspiracy to commit sex trafficking by force, fraud, or coercion and to use an interstate facility to promote an unlawful activity, in violation of 18 U.S.C. § 371; sex trafficking by force, fraud or coercion, in violation of 18 U.S.C. §§ 1591 and 1594; possession of firearms and ammunition by

a drug user, in violation of 18 U.S.C. § 922(g)(3); and using an interstate facility to facilitate an unlawful activity, in violation of 18 U.S.C. § 1952(a).  Defendant was arrested in the Eastern District of Missouri, transported to the Western District of Missouri, and appeared before me for a first appearance on September 23, 2010.  The government filed a motion for a detention hearing and a motion to continue the hearing for three days.  Those motions were granted, and defendant was remanded to the custody of the United States Marshal pending the hearing.

A detention hearing was held before me on September 28, 2010.  Defendant appeared in person, represented by Carter Collins Law and Lance Sandage.  The government was represented by Assistant United States Attorney Cynthia Cordes.  The parties stipulated that the court consider the information in the Pretrial Services Report of Pretrial Services Officer Anthony Byrd along with the supplement prepared by Pretrial Services Officer Tim Hair as the testimony Mr. Hair would give, under oath, if called as a witness, with one exception.  The report states that defendant's father was noncommital about signing a bond.  Defense counsel stated that defendant's father is supportive of his son and is willing to sign a bond on his son's behalf.  Special Agent Samuel Benson testified, and the following exhibits were admitted:

2

P. Ex. 1      Photograph of mobile home
        P. Ex. 2-21   Photographs of FV1, FV2, FV3, and FV4 (under
                      seal)

Finally, I judicially noticed the statutory presumption against release.[1]

## II. *FINDINGS OF FACT*

On the basis of the information contained in the reports of the Pretrial Services Officers and the evidence presented at the hearing, I find that:

1.  Defendant, 31, is a lifelong resident of the Eastern District of Missouri. He has lived at his current residence, 11526 Big Bend Road, Kirkwood, Missouri, for the past four years. His girl friend lives with him. Defendant's parents and a brother live in St. Louis, Missouri. Defendant has never been married and has no children.

2.  Defendant attended school through ninth grade and eventually earned a GED. He attended St. Louis University and came within one class of earning a bachelor of science degree in Political Science. Defendant was a self-employed real estate broker but has not had any business for the past two years. His financial assets include a residence valued at $280,000 with a

---

[1] 18 U.S.C. § 3142(e) states in pertinent part as follows: "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense . . . in violation of 18 U.S.C. § 1591 or 2421."

3

$1,326 monthly payment on a $180,000 outstanding balance. His estimated net worth is $187,000, and his estimated monthly cash flow is a negative $1,326 due to having no income. Despite reporting no income to the Pretrial Services Officer in St. Louis, defendant reported to the Pretrial Services Officer in Kansas City that he is also an automobile broker, buying vehicles at wholesale prices and selling them for a profit which earns him approximately $5,000 per month.

3. Defendant is generally in good health. He began using alcohol at age 16, uses it weekly, and last used it a day before his arrest. He began using marijuana at age 16, uses it occasionally, and last used it nine months ago. He began using cocaine at age 18, uses it occasionally, and last used it two years ago.

4. Defendant's criminal history consists of the following:

- An active Wanted Person was issued on August 4, 2010, by the Kirkwood Police Department due to exceeding the speed in the 30 mph zone
- An active Wanted Person was issued on January 12, 2010, by the Maryland Heights Police Department for failure to appear stemming from a failure-to-register-vehicle citation.
- Citations/summonses for the follow: Failure to appear, violating electrical signal, driving with license suspended, other moving and non-moving traffic citations
- Arrests with no conviction or disposition for disobeying steady red signal and failed financial responsibility.

5. The victim in this case, hereinafter referred to as FV1, met defendant through co-defendant Edward Bagley, Sr.

Bagley originally contacted defendant through instant messaging on websites dealing with torture/mutilation or BDSM.[2] Videos and pictures of FV1 were displayed on the internet on those websites. Bagley shared videos and pictures of FV1 with defendant directly as well.

6.  Defendant routinely went to the mobile home residence in Lebanon, Missouri, occupied by Bagley. There he had oral sex, anal sex and vaginal sex with FV1. He also engaged in extensive electrocution of her. FV1 was hooked up to an old-style wall crank phone. The electrical wires were attached to her genitalia, her breasts, her toes, and other parts of her body. Turning the crank on the side of the phone would generate an electrical shock. FV1 said defendant used this crank phone on her each time he came to the Bagley residence. She described it as, "constant, non-stop." On one occasion FV1 used a safe word trying to get defendant to stop, but he laughed at her and continued to crank even harder. Defendant used the electrical shock device on FV1 for several hours at a time, and it happened so many times she lost count.

7.  During these shocking incidents, FV1 was bound inside a small wire dog cage which was suspended above a "spanking bench." Photographs seized from the Bagley residence show FV1 in this position. Ankle and wrist restraints attach to the inside of the

---

[2]BDSM refers to "bondage discipline sadism masochism".

5

cage and there is a series of padlocks around the cage to prevent it from falling apart. FV1 is wearing a hood. A wire coming from the phone is attached to FV1's toes and another is attached to a metal ring piercing her labia. A "butt plug" has also been inserted. FV1 explained that the individual wanting to conduct the electrocution would crank the handle on the side of the phone. FV1 stated that these photographs depict her condition when defendant would electrocute her.

8. FV1's experience with defendant led her to describe him as a very violent individual who absolutely enjoyed the electrocution and objectification of her.

9. Before defendant's arrival, Bagley would instruct FV1 to "get ready" which caused her to experience overwhelming dread. FV1 was to give herself an enema to prevent defecation during her electrocution. She had to shower and shave her vaginal area in order to establish a better electrical connection.

10. Defendant would often bring videos he had downloaded illegally from the internet from insex.com showing mutilation and torture of women. One in particular showed a male burying women alive.

11. Defendant's girl friend is a naturalized citizen who was born in Albania. They had been dating for five to seven years. Defendant introduced his girl friend to BDSM by showing her the websites. She told authorities that she did not like it,

but she engaged in these activities because defendant insisted on it. She also engaged in sexual intercourse with other individuals at defendant's request, and he did the same. She described her relationship with defendant as very volatile and said defendant has a violent temper. Defendant took photographs of some of the activities in which he engaged with his girl friend (referred to during the hearing as FV2). Those pictures depicted a FV2 during a water boarding incident, FV2 bound, FV2 tied up and gagged, FV2 tied up and blindfolded, FV2 tied up and with clothespins on her nipples, and evidence of severe spanking. These photographs were seized from defendant's computer during execution of a search warrant. Defendant referred to his girl friend as "slave" which she hated.

12. Defendant's girl friend was present during communications between defendant and Bagley. She reported that she was with defendant when they saw a streaming video and pictures of FV1 on the internet. She said FV1 did not look like she was enjoying being tortured or mutilated; rather she was silent and looked very uncomfortable. She saw pictures of FV1 with her vagina sewn shut, with FV1 in crates, with FV1 wearing gags, and of FV1 with her breasts nailed to a 2x4 board. Those pictures were seized from Bagley's computer and identified by defendant's girl friend as the ones she and defendant saw online.

7

13. Defendant's girl friend called 911 one time because he was strangling her. On another occasion, the girl friend's younger sister called 911 when defendant broke his girl friend's nose while they were in a moving car.

14. Defendant's girl friend stated that it was "routine" for her to have to bail him out of jail because he would rarely go to court to pay his traffic tickets. The girl friend stated that over the past two years, defendant has heavily used alcohol, marijuana, and cocaine.

15. When police searched defendant's computer, they discovered photographs of more than 50 women in various states of mutilation and torture which authorities believe were downloaded from alt.com or insex.com. In addition, defendant had pictures of himself engaging in violent sexual activities with an unidentified woman (FV3), and a picture of yet another woman (FV4) who was bound.

16. At the time defendant was interviewed by the FBI, he admitted having seen pictures of Bagley conducting various forms of torture, mutilation, and whipping involving FV1. He also saw Bagley using an electrical device called a "violet wand." Defendant said he went to Bagley's residence to watch football whenever he was in the area on business. He admitted having given Bagley videos of mutilation and torture that had been downloaded, and he said he had smoked marijuana with Bagley.

17. Defendant told the FBI that he witnessed Bagley with FV1. He described it as a master-slave relationship: FV1 did what she was told to do immediately when she was told to do it; she was not allowed to call Bagley by any name other than "Sir" or "Master"; it was not roleplaying but was a lifestyle that Bagley chose; that FV1 had no life outside of Bagley as she was at the residence all the time. Defendant observed Bagley yell at FV1 for not rolling joints fast enough, and he observed Bagley punishing FV1.

18. Defendant described FV1 as not very smart, not aware of her surroundings, not a very intelligent kid.

19. During his interview with the FBI, defendant said that he and his girl friend had broken up and were no longer in contact. The FBI learned the girl friend's address which they discovered was defendant's address. When they went to the house and asked about the girl friend, defendant denied knowing anything about her whereabouts. The FBI was eventually able to get in touch with the girl friend through a text message. A meeting was set up to conduct an interview. A few hours after that was arranged, the girl friend called back and said she did not want to meet, that defendant had retained counsel for her and that attorney had advised her not to talk to the FBI.

20. During the interviews with defendant prior to execution of a search warrant at his residence, defendant was told that he

9

was being interviewed as a witness in the Bagley investigation and that he was not a target, because he had not become a target at that point.

21.  During an interview with the FBI after the warrant was executed at his home, defendant said the only reason he was there was because he was told it was the only way he could get back the property seized during execution of the search warrant. Defendant was belligerent and called the agents names.

22.  During execution of the search warrant, three agents had to pull defendant out of the doorway in order to secure his hands for officer safety after he refused to obey a command to show his hands and step out of the doorway.  This was after 20 minutes had passed from the time the officers called defendant on a PA system and told him to come to the front door.  In addition to his computer, marijuana and firearms were seized from defendant's residence.

23.  If convicted, defendant faces a statutory minimum prison sentence of 15 years on count two and a statutory maximum prison sentence of life on that count plus maximum sentences of five to ten years on the remaining counts.

### III. CONCLUSIONS

I find by a preponderance of the evidence that no single condition of release or combination of conditions of release will reasonably assure the appearance of defendant as required.

10

Defendant is facing a minimum 15-year prison term and a possible life sentence in this case. Defendant has a history of failing to appear and had two "wanted persons" outstanding at the time of his arrest. He resisted police directives to show his hands and step out of the doorway, and he waited 20 minutes after being directed by police to come to the door before he complied. Although defendant voluntarily met with agents during the investigation, he was under the belief at that time that he was not a target of the investigation.

I have considered the presumption provided for in 18 U.S.C. § 3142(e) that there is no condition or combination of conditions of release that will reasonably assure the appearance of defendant as required.

> "In a presumption case such as this, a defendant bears a limited burden of production -- not a burden of persuasion -- to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight. . . . Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."

United States v. Abad, 350 F.3d 793, 797 (8th Cir. 2003) (quoting United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001)).

Whether defendant has rebutted the presumption or not is irrelevant, as I find that the government has satisfied its burden of proving by a preponderance of the evidence that defendant is a flight risk and that no combination of condition

11

of release can reasonably assure his appearance as required.

I find by clear and convincing evidence that no single condition or combination of conditions of release will reasonably assure the safety of the community. Defendant is charged with crimes of violence. He allegedly tortured a female victim for hours at a time without her consent -- and here I note that defendant told the FBI that FV1 did what she was told immediately when she was told to do it, that she was not very intelligent and not aware of her surroundings; therefore, it is not plausible that defendant would believe FV1 consented to hours of electrocution especially after she used a "safe" word to try to make him stop. Regardless of whether FV2 consented to the violent sexual conduct with defendant, she clearly did not consent to having her nose broken by him while in a car which is evidenced by the call to 911, nor did she consent to being strangled, also evidenced by her call to 911. Both FV1 and FV2 described defendant as being violent and having a violent temper. Defendant has a long history of illegal drug use, and he essentially wrestled with three FBI agents after refusing to obey their commands.

As far as the presumption, I find that regardless of whether it has been rebutted, it remains as a factor to consider in this analysis. With or without considering that presumption, I find by clear and convincing evidence that there is no condition or

12

combination of conditions of release that will reasonably assure the safety of the community in this case.

It is, therefore

ORDERED that the defendant be committed to the custody of the Attorney General or his authorized representative for detention pending trial.  It is further

ORDERED that defendant be confined in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  It is further

ORDERED that the Attorney General or his authorized representative ensure that the defendant is afforded reasonable opportunity for private consultation with his counsel.  It is further

ORDERED that, on order of a court in the Western District of Missouri, the person in charge of the corrections facility where defendant is confined deliver the defendant to a United States Marshal for his appearance in connection with a court proceeding.

                                /s/ Robert E. Larsen
                                ROBERT E. LARSEN
                                United States Magistrate Judge

Kansas City, Missouri
October 6, 2010